IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 04-cv-4256-JPG |
| | ) | |
| RONALD KOSYDOR, | ) | |
| | ) | |
| Defendant. | ) | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**GILBERT, District Judge:**

This case was tried in front of the Court on June 25, 2007.  At the conclusion of the

evidence and arguments, the Court ruled in favor of the United States and against the defendant,

Ronald Kosydor, on Count IV under the Illinois Wrongful Tree Cutting Act (hereafter the

"WTCA").  The Court ruled in favor of the defendant, Ronald Kosydor, and against the United

States on Count III for unjust enrichment.

## I.   FINDINGS OF FACT

1.      Terry Foster has resided at 170 Burchyett Lane, Jonesboro, Illinois, since 1991, and

his property, consisting of approximately eighty (80) acres, is adjacent to the Shawnee National

Forest (hereafter "the Shawnee") on the north, south, and west sides.  (Trial transcript, p. 5-6).

2.      Larry Griffin, at the time relevant to this cause of action, was a conservation officer

for the State of Illinois, Department of Natural Resources.  (Griffin transcript, p. 4-5).

3.      In late November 1999, Mr. Griffin went to the Foster property to investigate a deer

hunting complaint and noticed timber cut off of what appeared to be the Shawnee.  (Griffin

transcript, p. 22).  At the time, the boundary line between Mr. Foster's property and the Shawnee

was not marked, and no survey had ever been conducted to establish the boundary line.

4.      Mr. Griffin contacted Forest Service law enforcement some time in December 1999 about the apparent timber trespass.  (Griffin transcript, p. 9-10).  Griffin was not able to recall the exact date when he contacted the Forest Service.

5.      The following spring, the Forest Service initiated a survey to establish the actual boundary line between Mr. Foster's property and the Shawnee.  David Hills, at the time relevant to this cause of action, was a licensed professional surveyor in the State of Illinois and was employed as a forest land surveyor for the Shawnee.  One of his duties was to survey boundaries between the Shawnee and private land.  (Hills transcript, p. 8-9).

6.      At the direction of the Forest Service, Mr. Hills conducted a survey and marked the boundary lines between national forest land and lands owned by Mr. Foster from approximately April of 2000 to February or March 2001.  (Hills transcript, p. 11, 24).

7.      Once Mr. Hills had located the boundary lines and marked them with temporary markers, the Forest Service initiated a timber cruise.  Roy Street, at the time relevant to this cause of action, had been a certified timber technician with the Forest Service for approximately 20 years. He conducted a timber cruise, along with two other team members, on December 7, 2000; January 18, 2001; and January 23, 2001, related to the apparent timber trespass onto the Shawnee.  (Trial transcript, p. 34, 36).

8.      Timber cruising includes identifying a tree species, taking stump diameter measurements, taking measurements from the stump to the top of the tree left on the ground, taking measurements of any logs left on the ground, and recording measurements on a tally sheet.  (Trial transcript, p. 37-38, 41).

9.      The timber cruising team used a grid-type method to find and identify stumps.  (Trial transcript, p. 39).  Once a stump was found and identified, it was marked with marking paint to

2

show that the stump had been counted.

10.     A total of 231 tree stumps were counted on the Shawnee property in the area adjacent to Mr. Foster's property.  (Trial transcript, p. 41-42).  Information regarding each stump was recorded, including its species, its diameter, and the distance from the stump to the corresponding tree top left in the woods.  (Plaintiff's Ex. 7).

11.     The key issue of fact is whether the defendant, Mr. Kosydor, cut the government's 231 trees.  The Court finds that he did.  More particularly, the Court finds that Mr. Kosydor and an employee taking his direction entered onto the Shawnee in the summer and early fall of 1998, without permission, and intentionally cut or caused to be cut 231 of the government's trees and that Mr. Kosydor did not have any legal right to do so.

12.     Mr. Kosydor owned and operated a timber logging business in 1998. (Trial transcript, p. 141).

13.     Mr. Foster entered into a contract with Mr. Kosydor in June 1998 for Mr. Kosydor to harvest timber from Mr. Foster's property.  (Plaintiff's Ex. 3; Trial transcript, p. 6-7, 141).  The agreement provided for a 50/50 split of proceeds generally, with a 70/30 split on walnut veneer in favor of Mr. Foster.  (Plaintiff's Ex. 3).  Logging took place during the summer and possibly into the early fall of 1998.

14.     Mr. Kosydor was in charge of the logging operation on Mr. Foster's property and was aware that Mr. Foster's property bordered the Shawnee. (Trial transcript, p. 152, 155).

15.     Bruce Pitts was an employee of Mr. Kosydor and was the tree cutter primarily responsible for operating the chain saw during the logging operation.  (Trial transcript, p. 115-116, 152-153).

16.     Having been made aware of the location of the boundary lines subsequent to the logging operation, Mr. Pitts testified unequivocally at trial that he had cut trees from the Shawnee and that he had done so under the direction of Mr. Kosydor.  (Trial transcript, p. 137).  Based on Mr. Pitts's demeanor while testifying and the general consistency of his testimony with other evidence at trial, the Court found his testimony credible.

17.     Circumstantial evidence established that Mr. Kosydor was responsible for cutting all 231 of the government's trees.

18.     No one except Mr. Kosydor logged off of or adjacent to Mr. Foster's property during the time period in question.  Mr. Foster was unaware of anyone else, other than Mr. Kosydor, doing logging off of those areas during the period of time that he has lived there.  (Trial transcript, p. 12). The only reasonably available route for accessing and removing the wrongfully cut timber passes over Mr. Foster's property and within very close proximity to his residence.  It is highly implausible that a logging operation, involving the regular use of heavy equipment and chainsaws, could have been based on Mr. Foster's property without him being aware of it.

19.     Mr. Kosydor's logging crew accessed the area where the tree cutting was to be done by following a driveway that went past Mr. Foster's residence and then following that road across a ditch into a non-timbered open field on the western side of Mr. Foster's property.  The field was used as a log yard and staging area.  The logging trucks, which removed logs from the property, accessed the log staging area by the same route.  (Trial transcript, p. 123, 158-159).

20.     There was no other reasonable way to access the suspected trespass area other than by going past Mr. Foster's residence and through his field.  (Trial transcript, p. 49).  Mr. Street's testimony on this topic was credible because he was not only familiar with the area from the timber

cruise, but had also inspected the area of the timber cutting just a week prior to trial. (Trial transcript, p. 50)

21.     Further, it would have been very difficult, very costly and highly impractical to do logging in the trespass area and then remove the timber out to the west (away from Mr. Foster's property, as opposed to through it) due to a lot of drains and changes in topography. (Trial transcript, p. 50). The Court finds Mr. Street's testimony on this point to be consistent with its own inspection of the topographical map of the area. (Plaintiff's Ex. 5).

22.     Further, trees were cut on the west side of Mr. Foster's field. (Trial transcript, p. 121, 124, 136, 157-58). It is clear from the map of the area that any trees cut to the west of Mr. Foster's field were located inside the Shawnee. (Plaintiff's Ex. 5).

23.     The Court finds that Mr. Kosydor voluntarily took on the responsibility of determining the boundary line between Mr. Foster's property and the Shawnee, despite a provision in their contract that Mr. Foster would be responsible for doing so.

24.     Mr. Foster did not know exactly where the boundary lines of his property were and that, prior to the start of logging, Mr. Kosydor verbally agreed that he would find the boundary lines of Mr. Foster's property using a GPS. (Trial transcript, p. 9). Mr. Foster's testimony on this point is supported by the testimony of Mr. Pitts and Mr. Kosydor, both of whom testified that Mr. Kosydor established the perimeter for the logging by walking the area with a compass and directing Mr. Pitts to mark a line with colored flagging tape. (Trial transcript, p. 118, 156). Mr. Foster also testified that he saw Mr. Kosydor walking the area with a compass and directing his employees to mark the perimeter with flagging tape. (Trial transcript, p. 10-11). The Court notes Mr. Kosydor's inconsistent deposition testimony, wherein Mr. Kosydor claimed that Mr. Foster had marked the

property lines. (Trial transcript, p. 156). This deposition testimony is immaterial in light of the conflicting trial testimony.

25.     Mr. Kosydor was in charge of the entire logging operation, although he was not actually operating a saw and cutting trees. Mr. Kosydor established the perimeter for the logging and cutting within that perimeter took place according to his instructions. (Trial transcript, p. 117-118). Individuals working with Mr. Kosydor, such as Mr. Pitts, were mere employees acting under Mr. Kosydor's supervision.

26.     Determining the value of the wrongfully cut timber is, by necessity, a matter of estimation, as the actual timber in question has long since been delivered to various timber mills and processed.

27.     Michael Van Dyck is a measurement specialist for the Forest Service, and he calculates timber volume and timber value estimates for the Forest Service. (Trial transcript, p. 71-72). Mr. Van Dyck reviewed the Forest Service's timber volume and value estimates in this case and provided background about how such estimates are generally made.

28.     There are two ways to place a value on timber: one is stumpage value which is the value of standing trees or what one might pay for the right to cut and remove trees; and the other is timber value which is the value paid by mills for cut logs. (Trial transcript, p. 75).

29.     Stumpage value and timber value estimates both depend upon timber volume estimates, which in turn are based upon the raw data collected in the field by timber cruisers. Put another way, estimating the value of timber in a trespass scenario involves a three step process. First, as described above, a timber cruise is conducted and certain measurements are taken in the field. Second, the collected raw measurements are then converted into volume estimates using

established mathematical formulas. Third, those volume estimates are then converted into value

estimates. (Trial transcript, p. 74-77). The distinction between timber value and stumpage value

only comes into play during the third step of the process.

30. In this case, the Forest Service input the collected raw data into a computer program,

the National Timber Cruising Program, which converted the raw data into estimated timber volumes

for the individual trees and summed those volumes by species. (Trial transcript, p. 82). Although

the reliability of the National Timber Cruising Program has not been disputed, the computer

program obviously relies upon reliable data being input. Mr. Van Dyck admitted on direct

examination that the Forest Service had made some errors inputting raw data into the National

Timber Cruising Program. In Mr. Van Dyck's opinion, these errors did not significantly impact the

timber volume estimates, but it is not clear exactly what impact the errors had.

31. Having made its timber volume estimates, the Forest Service then assigned an

average stumpage price per board feet for each relevant species. These average prices were taken

from a table produced by the Illinois Department of Natural Resources for the relevant time period.

(Plaintiff's Ex. 13). The average price for each species was then multiplied by the volume estimate

for that species. According to Mr. Van Dyck, the Forest Service thereby reached a reasonable and

reliable estimate of the stumpage value, that being $13,911.80. (Trial transcript, p. 93, 98-99). This

is the only evidence of stumpage value that the Court has before it, as the defendant elected to not

put on any evidence of an alternative stumpage value estimate.

32. The Court finds that the stumpage value of the removed trees is $12,520.62. Giving

Mr. Kosydor the benefit of the doubt, the Court is making a ten percent reduction of the Forest

Service's estimate. The Court finds that such a reduction is appropriate in light of the fact that

assigning a stumpage value to the missing logs is a matter of estimation and that the Forest

Service's own expert witness, Mr. Van Dyck, concedes some error in the process, albeit

insignificant in his opinion.

33.     For reasons discussed below, the Court finds the timber value of the trees to be

irrelevant, and therefore makes no finding regarding the timber value of the wrongfully cut trees.

## II.     CONCLUSIONS OF LAW

1.     This Court has jurisdiction over the subject matter and the parties.  *See* 28 U.S.C.

§ 1345, which provides that district courts have original jurisdiction over civil actions commenced

by the United States.

2.     The government's Amended Complaint alleged four causes of action against Mr.

Foster and Mr. Kosydor: (1) trespass; (2) conversion; (3) violation of the WTCA, 740 ILCS

185/0.01, *et. seq*.; and (4) unjust enrichment.  The government and Mr. Foster settled prior to trial,

with Mr. Foster agreeing to pay the government $18,000.  At trial, the government proceeded

against Kosydor on only the WTCA and unjust enrichment claims.  It voluntarily dismissed the

claims for trespass and conversion.

### A.     *The WTCA*

3.     The WTCA was in force in the State of Illinois at the time of the occurrence that is

the subject of this lawsuit.  *See* 740 ILCS 185/0.01, *et. seq*.  To prevail on its WTCA claim, the

government was required to prove by a preponderance of the evidence that the defendant, Mr.

Kosydor, intentionally cut or knowingly caused to be cut any timber or tree belonging to the United

States which he did not have the full legal right to cut or caused [*sic*] to be cut.  *See* 740 ILCS

185/2, *et. seq*.; *Marsella v. Shaffer*, 754 N.E.2d 411 (Ill. App. Ct. 2001) (approving jury instruction

that had been given in an action for violation of the WTCA).

4.      The WTCA provides that any party found to have violated the Act shall pay the owner of the timber or trees three times its stumpage value. *See* 740 ILCS 185/2.

5.      As set forth above, the Court finds that Mr. Kosydor intentionally cut or caused to be cut 231 trees belonging to the United States which he did not have any legal right to cut or cause to be cut. Mr. Kosydor hired individuals to assist him, and thus may not have personally cut the trees in question. The Court concludes, however, that he knowingly caused the trees to be cut within the meaning of the WTCA. Mr. Kosydor established the perimeter for the logging, and he was the person directing the logging operation. The WTCA imposes liability not only on those who cut timber, but on those who "knowingly cause" timber to be cut. Thus, Mr. Kosydor is liable under the WTCA. *See* 740 ILCS 185/2.

6.      Mr. Kosydor has essentially argued that the United States has the burden of showing that he intended to trespass upon the Shawnee. The Court disagrees, and concludes that with respect to the WTCA claim, the only intent required is intent to cut the plaintiff's trees. Mr. Kosydor's allegedly innocent mistake as to the location of the boundary line is not a defense to the WTCA claim.

7.      Mr. Kosydor's argument has been expressly rejected by one Illinois Court. In *Aaron v. Hendrickson*, 582 N.E.2d 759, 767-68 (Ill. App. Ct. 1991), the defendant timber cutters argued that they could not be held liable under the WTCA when they did not know they were cutting the plaintiff's trees and had made an innocent mistake with respect to the boundary line. The Court concluded that the WTCA was "meant to discourage not only the malevolent timbermen but also the errant timbermen." *Id*. at 767. The Court explained, as follows:

> It is rational that the burden of establishing boundaries be placed on a defendant who orders wood to be cut. Otherwise, as plaintiffs point out, it would be advantageous for a defendant to cut now and worry later about tree boundary lines since the maximum financial burden he would face would be the stumpage value of the severed trees. We find that the reasonable interpretation of the Act is that an innocent owner of wrongfully cut timber can recover even without proving malicious and wilful misconduct on the part of a defendant.

*Id*. at 768; *see also Marsella*, 754 N.E.2d at 419 (citing *Aaron*, 582 N.E.2d at 768, and agreeing that one purpose of the WTCA is to discourage timber cutters from cutting trees without thoroughly checking out the boundary lines).

8.      Under the WTCA, the trebling of stumpage value is mandatory.  In this case, the stumpage value of $12,520.62 multiplied times three equals $37,561.86.

9.      The government has conceded that Mr. Kosydor is entitled to an $18,000 set-off to reflect the government's settlement with Mr. Foster.  After making this set-off, the total award for the government's WTCA claim is $19,561.86.

**B.      *Unjust Enrichment***

10.      To prevail on its claim of unjust enrichment, the government must prove by a preponderance of the evidence that Mr. Kosydor has unjustly retained a benefit to the detriment of the United States and that Mr. Kosydor's retention of the benefit violates the fundamental principles of justice, equity, and good conscience.  *See Midcoast Aviation, Inc. v. General Elec. Credit Corp.*, 907 F.2d 732, 737, 741-45 (7th Cir. 1990) (collecting and discussing Illinois case law).

11.      The measure of damages for unjust enrichment is the value of any net profits unjustly retained by Kosydor.  *See id.*

12.      In this case, there is no evidence establishing Mr. Kosydor's net profits from the wrongful tree cutting.  The government has put on evidence of the mill value (also known as the

timber value) of the wrongfully cut trees.  This evidence, however, is at best an estimate of Mr.

Kosydor's gross proceeds from the wrongful cutting.  To prevail on its unjust enrichment claim, it

was the government's burden to establish Mr. Kosydor's net proceeds, and the government has

failed to put on any such evidence.  Therefore, the Court concludes that there is not a legally

sufficient evidentiary basis to find in favor of the government on its unjust enrichment claim.

   **C.**      ***Statute of Limitations***

   13.      Mr. Kosydor has argued that the government's WTCA claim is subject to the three-

year statute of limitations generally applicable to tort claims brought by the United States.  *See* 28

U.S.C. § 2415(b).  On the other hand, the government contends that the Court should use the six-

year statute of limitations applicable to trespass and conversion claims brought by the United States,

*see id.*, or alternatively Illinois' five-year statute of limitations that would apply to any private party

bringing a claim under the WTCA.  *See* 735 ILCS 5/13-205 (applicable to claims of conversion and

all other civil actions for which there is no other specific statute of limitations).

   14.      The Court concludes that the Illinois statute of limitations does not apply to the

United States' cause of action.  "It is well settled that the United States is not bound by state statutes

of limitation . . . in enforcing its rights."  *United States v. Summerlin*, 310 U.S. 414, 416 (1940)

(citing *United States v. Thompson*, 98 U.S. 486 (1879); *United States v. Nashville, Chattanooga &*

*St. Louis Ry.*, 118 U.S. 120, 125 (1886)).  "When the United States becomes entitled to a claim,

acting in its governmental capacity, and asserts its claim in that right, it cannot be deemed to have

abdicated its governmental authority so as to become subject to a state statute putting a time limit

upon enforcement."  *Summerlin*, 310 U.S. at 417.  This rule is grounded in the "public policy of

preserving the public rights, revenues, and property from injury and loss, by the negligence of

public officers." *Guaranty Trust Co. v. United States*, 304 U.S. 126, 132 (1938) (internal quotations omitted).

      15.     Having concluded that the state statute of limitations does not apply, the Court must determine whether the WTCA claim is subject to the federal statute's three-year or six-year limitation period. Section 2415 generally provides a three-year limitations period for "torts," but then specifically provides that the torts of trespass to land and conversion are subject to a six-year limitations period. Without doubt, the WTCA claim is in the nature of a tort, as even trespass and conversion are torts. Therefore, to say that the WTCA claim is in the nature of a tort does not end the inquiry. Assuming that § 2415 is applicable, the critical question is whether the cause of action created by the WTCA is most like a trespass or conversion, or most like some other tort such as negligence, battery, assault, or false imprisonment. The Court has not found any case law categorizing the WTCA claim for the purposes of the federal statute of limitations. The Court notes, however, that much like the tort of trespass, the WTCA involves a physical invasion onto the plaintiff's real property. Moreover, much like the tort of conversion, the WTCA involves interference with plaintiff's right of possession. Therefore, the Court concludes that the six-year limitations period is applicable.

      16.     The government filed this lawsuit more than six-years after Mr. Kosydor cut the trees from the Shawnee. Therefore, even under the six-year limitations period, the government must rely on tolling rules in order to escape dismissal. The tolling rule applicable to the federal statutes of limitations in § 2415 excludes from the running of the statute "all periods during which . . . facts material to the right of action are not known and reasonably could not be known by an official of the United States charged with the responsibility to act in the circumstances . . . ." 28

U.S.C. § 2416(c).

17.     As set forth above, the undisputed evidence in this case is that no agent or officer of the United States had any knowledge of the subject tree cutting until sometime in December 1999, when Illinois Conservation Officer Larry Griffin informed the United States Forest Service about an apparent trespass.  The complaint in this matter was filed on December 15, 2004, well within six years of the Forest Service first learning about the apparent trespass.  Thus, the claim was timely filed.

18.     Even if the Court were to apply Illinois' five-year limitations period, 735 ILCS 5/13-205, the Court would still conclude that the WTCA claim was timely filed.  Under Illinois law, a cause of action does not accrue and the statute of limitations does not begin running "until the plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Hermitage Crop. v. Contractors Adjustment Co.*, 651 N.E.2d 1132, 1135, 1138 (Ill. 1995) (internal quotations omitted).  In this case, the United States brought the WTCA claim approximately five years after having first learned about the apparent trespass.  The limitations period, however, would not begin to run at the first moment that the Forest Service was informed about an apparent trespass.  The United States was not in any position to *know* that its trees had been wrongfully cut until it had an opportunity to survey and inspect the area of the apparent trespass.  Acting with reasonable diligence, the United States initiated a survey of the boundary lines in April 2000 and completed the survey in March 2001.  The Court need not determine the precise date when the United States knew or should have known about the wrongful tree cutting.  It would be enough for the Court to conclude that the United States filed its claim within five years of such date, and the Court does so conclude.

### III.    CONCLUSION

The United States has voluntarily dismissed its Counts I (trespass) and II (conversion).  **IT IS ORDERED** that judgment shall be entered in Count III (unjust enrichment) in favor of the defendant, Ronald Kosydor.  **IT IS FURTHER ORDERED** that judgment shall be entered in Count IV (Illinois Wrongful Tree Cutting Act) in favor of the plaintiff, the United States, in the amount of $19,561.86.  The United States shall file its bill of costs, if any, within ten days of the entry of this judgment.

**IT IS SO ORDERED**
**Dated:  August 21, 2007**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**United States District Judge**